**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Scot Anthony Reyes, | No. CV-24-01460-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of his applications for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 18), the Commissioner's answering brief (Doc. 22), and Plaintiff's reply (Doc. 23), as well as the Administrative Record (Docs. 8-12, "AR"), and now affirms the Administrative Law Judge's ("ALJ") decision.

I.    <u>Procedural History</u>

Plaintiff filed applications for benefits on August 3, 2020 and October 2, 2020, eventually alleging a disability onset date of December 12, 2019. (AR at 27.) The Social Security Administration ("SSA") denied Plaintiff's application at the initial and reconsideration levels. (*Id.*) On September 25, 2023, following a hearing and a supplemental hearing, the ALJ issued an unfavorable decision. (*Id.* at 27-46.) The Appeals Council later denied review. (*Id.* at 1-4.)

…

II.    <u>The Sequential Evaluation Process and Judicial Review</u>

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. 20 C.F.R. § 416.920(a). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant has engaged in substantial, gainful work activity. 20 C.F.R. § 416.920(a)(4)(i). At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id*. § 416.920(a)(4)(ii). At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id*. § 416.920(a)(4)(iii). If so, the claimant is disabled. *Id.* If not, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to step four, where the ALJ determines whether the claimant is still capable of performing past relevant work. *Id*. § 416.920(a)(4)(iv). If not, the ALJ proceeds to the fifth and final step, where the ALJ determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. *Id*. § 416.920(a)(4)(v). If not, the claimant is disabled. *Id.*

An ALJ's factual findings "shall be conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (internal quotations omitted). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted). In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

1    III.    The ALJ's Decision

2        The ALJ concluded that Plaintiff had not engaged in substantial, gainful work

3    activity since the alleged onset date and that Plaintiff had the following severe impairments:

4    "Seizure disorder and Right humerus fracture status post arthroplasty."  (AR at 29-30.)[1]

5    Next, the ALJ concluded that Plaintiff's impairments did not meet or medically equal a

6    listing.  (*Id.* at 34.)  Next, the ALJ calculated Plaintiff's RFC as follows:

7
8        [T]he claimant has the residual functional capacity to perform light work as
         defined in 20 CFR 404.1567(b) and 416.967(b) except: The claimant can lift
9        and carry 20 pounds occasionally, and 10 pounds frequently.  There are no
         sitting, standing or walking limitations.  The claimant can never climb.  The
10       claimant can occasionally balance and crawl and frequently stoop.  The
         claimant can occasionally reach with the right upper extremity and frequently
11       handle, finger and feel with the right upper extremity.  The claimant must
         avoid working around heights and moving machinery.
12

13   (*Id.* at 34-35.)

14       As part of this RFC determination, the ALJ evaluated Plaintiff's symptom

15   testimony, concluding that Plaintiff's "statements concerning the intensity, persistence and

16   limiting effects of [his] symptoms are not entirely consistent with the medical evidence and

17   other evidence in the record for the reasons explained in this decision."  (*Id.* at 36.)

18       The ALJ also evaluated opinion evidence from 15 different medical sources,

19   concluding as follows: (1) M. Keer, D.O., state agency reviewing consultant ("partially

20   persuasive"); (2) A. Wong, M.D., state agency reviewing consultant ("more persuasive");

21   (3) D. Gross, Psy.D., psychological consultant ("not persuasive"); (4) R. Paxton, M.D.,

22   psychological consultant ("persuasive"); (5) Lauren Frey, M.D. ("somewhat persuasive");

23   (6) Wayne General, Ph.D., consultative examiner ("not persuasive"); (7) Wayne McIntosh,

24   DNP ("not persuasive"); (8) Arash Araghi, D.O. ("not persuasive"); (9) Hilary Delis, PAC

25   ("not supported by the record"); (10) Fauntly Skaggs, FNPC ("not persuasive"); (11)

26

27   _____

[1]    The ALJ also determined that Plaintiff had the non-severe impairments of
28   hypertension, arrhythmia status post pacemaker placement, status post stroke, headaches,
     sleep apnea, HIV, Fahr's syndrome, and cannabis abuse and the non-medically
     determinable impairment of Aspergers/autism.  (AR at 30-34.)

unidentified author from The Core Institute ("not persuasive"); (12) Arturo Sanchez, PA-C ("not persuasive"); (13) Beau Gardner, PMHNP ("not supported by the evidence as a whole . . . [and] inconsistent with his own examination findings"); (14) Christine Joy, PA, consultative examiner ("persuasive"); and (15) Ramit Kahlon, M.D. ("not persuasive"). (*Id.* at 39-44.)  Additionally, the ALJ "considered the statement of the claimant's friends and family" and concluded that "their statements are not persuasive of additional restrictions in the RFC.  Instead, these opinions support the conclusion reached herein as they indicate the claimant's ability to function is greater than alleged."  (*Id.* at 44-45.)

Based on the testimony of a vocational expert ("VE"), the ALJ concluded that Plaintiff was able to perform his past relevant work as a Furniture Salesperson.  (*Id.* at 45.)  Thus, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at 46.)

IV.    Discussion

Plaintiff raises the following issues on appeal (which the Court has reorganized here for purposes of clarity): (1) whether the ALJ erred at step two by characterizing his mental/cognitive impairments as non-severe; (2) whether, in the course of making this step-two error, the ALJ provided legally insufficient reasons for discrediting and/or accepting the opinions of various medical sources concerning his mental/cognitive impairments; and (3) whether the ALJ provided legally insufficient reasons for discrediting the opinions of Dr. Araghi concerning his physical impairments.  (Doc. 18 at 1.)  As a remedy, Plaintiff seeks a "[r]emand for calculation of benefits."  (*Id.* at 28.)

A.    **The ALJ's Step-Two Finding Of Non-Severity Concerning Plaintiff's Mental/Cognitive Impairments**

1.    The Parties' Arguments

Plaintiff contends that the ALJ erred during step two "by concluding Reyes's mental/cognitive impairments were not severe."  (Doc. 18 at 17.)  As discussed in more detail in Part IV.B below, Plaintiff contends this error resulted from the ALJ's improper consideration of the opinions of various medical sources related to his mental/cognitive impairments.  (*Id.* at 17-24.)

In response, the Commissioner defends the sufficiency of the ALJ's analysis but also contends, more broadly, that any step-two error was harmless because "the ALJ considered all of Plaintiff's medically determinable impairments, including those that were not severe, in assessing Plaintiff's RFC. . . .  Any error at step two is harmless when the ALJ considers the limitations posed by the alleged condition later in the sequential evaluation."  (Doc. 22 at 7.)

In reply, Plaintiff contends the Commissioner's claim of harmlessness is "mistaken as the ALJ failed to include any limitations related to mental/cognitive symptoms or limitations in the RFC when the ALJ acknowledged that a limitation to even unskilled work would direct a finding of disability under the medical-vocational guidelines as of Reyes's 55th birthday."  (Doc. 23 at 7.)

2.    <u>Analysis</u>

"As this Court has observed in earlier cases, Ninth Circuit law is not a model of clarity concerning how to evaluate claims of step-two error.  Some cases suggest that, although it is error for an ALJ to fail to characterize a particular impairment as 'severe' during step two, the error can be disregarded as harmless if the ALJ properly addresses the impairment during later steps.  Other decisions suggest that a claimant can't complain about an ALJ's failure to identify a particular impairment as 'severe' during step two so long as the ALJ determined the claimant also had other impairments that so qualify.  At any rate, the dispositive issue is whether the ALJ properly evaluated the evidence and testimony concerning that condition during later steps and factored that condition into the RFC."  *Harvey v. Comm'r of Soc. Sec. Admin.*, 2021 WL 5822641, *2 (D. Ariz. 2021) (cleaned up).

Given these principles, Plaintiff is not entitled to reversal based on his argument that the ALJ should have characterized his mental/cognitive impairments as severe during step two.  Any error in that determination was harmless because the ALJ determined that some of Plaintiff's other impairments were severe and thus proceeded to the later steps of the disability analysis. *See, e.g., Skelton v. Comm'r of Soc. Sec. Admin.*, 2023 WL 5949655,

*3 (D. Ariz. 2023) ("The dispositive issue here is whether Plaintiff has established the existence of harmful error with respect to the ALJ's RFC formulation during later steps. The dispute over the step-two severity characterization is a red herring.").

This determination does not, to be clear, foreclose Plaintiff from obtaining relief based on his criticisms of the ALJ's assessment of the opinion evidence related to his mental/cognitive impairments. It simply means that Plaintiff must establish that the ALJ erred during a later step of the analysis, such as when the ALJ determined which (if any) mental/cognitive impairments to include in the RFC. That issue is addressed in Part IV.B below.

B.    **The ALJ's Assessment Of The Six Opinions Related To Plaintiff's Mental/Cognitive Impairments**

    1.    <u>Standard Of Review</u>

"When determining whether a claimant is eligible for benefits, an ALJ need not take every medical opinion at face value. Rather, the ALJ must scrutinize the various—often conflicting—medical opinions to determine how much weight to afford each opinion." *Cross v. O'Malley*, 89 F.4th 1211, 1213-14 (9th Cir. 2024) (cleaned up)

In January 2017, the SSA amended the regulations concerning the evaluation of medical opinion evidence. *See Revisions to Rules Regarding Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations apply to applications filed on or after March 27, 2017, and are therefore applicable here. The new regulations provide in relevant part as follows:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. . . . The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . .

20 C.F.R. § 416.920c(a). Regarding the "supportability" factor, the new regulations explain that the "more relevant the objective medical evidence and supporting explanations

presented by a medical source are to support his or her medical opinion(s), . . . the more persuasive the medical opinions . . . will be." *Id.* § 404.1520c(c)(1). Regarding the "consistency" factor, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2).

The Ninth Circuit has confirmed that the "recent changes to the Social Security Administration's regulations displace our longstanding case law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an examining doctor's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022). Thus, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies. Now, an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.* With that said, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence. The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id.* at 792 (cleaned up). Although "an ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records. . . . [t]he ALJ no longer needs to make specific findings regarding these relationship factors . . . ." *Id.* (citation omitted).

## 2. NP McIntosh

As noted, the ALJ evaluated the opinions of 15 different medical sources. One of those sources was NP McIntosh, who had a treating relationship with Plaintiff. On June 24, 2021, NP McIntosh completed a checkbox form in which he circled boxes indicating, *inter alia*, that Plaintiff had moderate or moderately severe limitations in his ability to relate

1    to other people and to perform work on a sustained basis in a routine work setting.  (AR at

2    2216-17.)    NP McIntosh also checked a box indicating that Plaintiff's "prescribed

3    medications cause the patient any side effects" and then listed those side effects as

4    "sedation, irritability, focus."  (*Id.* at 2217.)

5            The ALJ deemed NP McIntosh's opinions "not persuasive," explaining:

6            Nurse McIntosh's opinion is not persuasive, as it is not supported by the
             evidence of record.  Nurse McIntosh's opinion is not consistent with his own
7            treatment notes.    Nurse McIntosh's mental status examinations of the
             claimant show generally normal findings and that the claimant has a
8            euthymic mood, full affect, clear speech, logical thought process, normal
             perception, normal cognition, normal insight and judgment, no delusions, no
9            hallucinations, average intelligence, no agitation, no anhedonia and no
             suicidal ideation.    Nurse McIntosh's notes show the claimant's only
10           medication side effects are sexual side effects.  In fact, the record shows that
             the claimant denied medication side effects.    Further, Nurse McIntosh
11           acknowledged in his notes that the claimant uses marijuana twice per day.
             Yet, he did not comment on the effect of the claimant's marijuana use on his
12           mental functioning.  Additionally, exams performed by other providers at
             Nurse McIntosh's practice also reveal normal mental findings.  Specifically,
13           these providers indicate the claimant has an appropriate mood and affect,
             normal memory, no mood swings, no paranoia, normal insight, normal
14           judgment, normal attention span and concentration and no suicidal ideation.
             During sessions the claimant reported his head space was good and no issues
15           with depression or anxiety.    He denied suicidal/homicidal ideation,
             hallucinations, paranoia.  He reported improved sleep, no nightmares and a
16           normal appetite.    These findings do not support the extreme limitations
             assessed by Nurse McIntosh and instead support the conclusion reached
17           herein.

18
19
20
21

22   (*Id.* at 40-41.)

23           An initial difficulty in evaluating Plaintiff's arguments regarding NP McIntosh is

24   that Plaintiff does not develop those arguments with the required degree of specificity.  In

25   one portion of his brief, Plaintiff provides a general discussion, not tied to any specific

26   medical source, as to why he believes the ALJ erred when analyzing the medical and

27   opinion evidence related to his mental/cognitive impairments.  (Doc. 18 at 18-20.)  Then,

28   in a later portion of his brief, Plaintiff simply cross-references that general discussion in

support of his claim that the ALJ's analysis of NP McIntosh's opinions was flawed.  (*Id.* at 20 ["The ALJ found the assessments from NP McIntosh and NP Gardner unpersuasive based on the ALJ's belief the assessments were unsupported and inconsistent with some normal mental status examination findings and some reports where Reyes denied mental health symptoms (i.e., alleged improvement or stability).   The insufficiency of this rationale has been addressed above, *supra* at 18-19."].)  This approach is unhelpful because it does not address the ALJ's specific reasons for discrediting NP McIntosh's opinions or the specific evidence that the ALJ cited in support of that determination.  For this reason, the Commissioner persuasively argues that "Plaintiff's failure to argue with any specificity means he has forfeited or waived any arguments on this issue." (Doc. 22 at 17.)[2]

Additionally, even assuming Plaintiff's challenge isn't forfeited, the ALJ's evaluation of NP McIntosh's opinions was free of harmful error on the merits.  As noted, "[t]he agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings."  *Woods*, 32 F.4th at 792 (cleaned up).  Here, the ALJ expressly considered both factors in relation to NP McIntosh—as set forth in the quoted passage above, the ALJ identified two reasons why the supportability factor undermined NP McIntosh's opinions (lack of support in NP McIntosh's own treatment notes, failure to consider marijuana use) and one reason why the consistency factor undermined NP McIntosh's opinions (exams by other medical providers revealed normal mental findings).

The ALJ's conclusion as to each factor was also supported by substantial evidence.  Beginning with the supportability factor, one of the ALJ's reasons for discrediting NP McIntosh's opinions was that "Nurse McIntosh's mental status examinations of the claimant show generally normal findings and that the claimant has a euthymic mood, full

---

[2]    For example, although the ALJ specifically identified, as part of the supportability analysis, a perceived conflict between NP McIntosh's opinion that Plaintiff's prescribed medications cause him to suffer the side effects of sedation, irritability, and focus and NP McIntosh's treatment notes (which, according to the ALJ, do not reflect such side effects) (AR at 41), Plaintiff does not acknowledge or address this portion of the ALJ's analysis in his opening brief.

affect, clear speech, logical thought process, normal perception, normal cognition, normal insight and judgment, no delusions, no hallucinations, average intelligence, no agitation, no anhedonia and no suicidal ideation." (AR at 41.) It was rational for the ALJ to reach this conclusion, as the record reveals multiple instances in which NP McIntosh made normal findings regarding Plaintiff's mental/cognitive condition during examinations, including findings as to Plaintiff's euthymic mood, logical thought process, normal cognition, average intelligence, full affect, and normal insight and judgment. (AR at 3557, 3908, 3914, 3917.) Plaintiff contends the ALJ placed too much emphasis on these particular examination records because they merely reflected "isolated reports of improvement" and should have been "viewed in the broader context of [his] impairments," which showed "[c]ycles of improvement" "manifested by waxing and waning symptoms." (Doc. 18 at 18-19, citation omitted.) But this is a situation where the evidence could have been rationally construed to support either the ALJ's interpretation or Plaintiff's interpretation, and "[w]hen evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted). *See also Woods*, 32 F.4th at 792-93 ("The ALJ found this [mental impairment] opinion unpersuasive because it was inconsistent with the overall treating notes and mental status exams in the record. Substantial evidence supports the ALJ's inconsistency finding."); *King v. Bisignano*, 2025 WL 1912359, *1 (9th Cir. 2025) ("The ALJ adequately explained her consideration of supportability and consistency in weighing Dr. Morgan's opinion. The ALJ found that Dr. Morgan's opinion—that Plaintiff had marked limitations in eleven categories of mental functioning—was inconsistent with Dr. Morgan's own finding at a mental status examination that Plaintiff was within normal limits in all but one mental category."); *Austin v. Dudek*, 2025 WL 957499, *1 (9th Cir. 2025) ("The ALJ also observed inconsistencies between the opinion and Dr. Knapp's observations of Austin's unremarkable 'logical and progressive thought processes, normal orientation, normal perception, cooperative and pleasant behavior' and her overall record, which included myriad normal cognitive and

mental status indicators and reports of daily living and social activities.  Accordingly, the ALJ's rejection of Dr. Knapp's opinion was reasonable and supported by substantial evidence . . . ."); *Kelley v. Kijakazi*, 2023 WL 6999445, *2 (9th Cir. 2023) ("The ALJ found that these opinions failed to consider a substantial amount of subsequently developed evidence and that these opinions were inconsistent with other evidence, such as Kelley's numerous normal mental status examinations . . . .  This analysis, considering supportability and consistency, was sufficient under the regulations.").

The ALJ's other reason for discrediting NP McIntosh's opinions under the supportability factor—failure to consider the effect of Plaintiff's marijuana use—was also rational and supported by substantial evidence.  Although Plaintiff argues that "NP's McIntosh's silence related to marijuana use" does not necessarily mean that NP McIntosh ignored the issue (Doc. 18 at 20 n.4), it was rational for the ALJ to conclude otherwise.  And as the Commissioner correctly notes in the answering brief, "this was a reasonable consideration as the record reflected that Plaintiff's providers were concerned about the effect marijuana use had on Plaintiff's mental health symptoms."  (Doc. 22 at 18, citations omitted.)

Turning to the consistency factor, the ALJ found that NP McIntosh's opinions were inconsistent with "exams performed by other providers at Nurse McIntosh's practice [that] also reveal normal mental findings."  (AR at 41.)  It was rational for the ALJ to reach this conclusion, as the record reveals multiple instances in which other providers made normal findings regarding Plaintiff's mental/cognitive condition during examinations.  (*See, e.g., id.* at 3569, 3575.  *See also id.* at 31-33 [ALJ's extensive summary of mental status exams].)  Once again, Plaintiff argues the ALJ's analysis was flawed because these multiple normal examinations were simply a part of the waxing and waning of his symptoms, but it was rational for the ALJ to conclude otherwise, particularly given the sheer number of normal examinations over an extended period of time.  *Woods*, 32 F.4th at 792-93; *King*, 2025 WL 1912359 at *1; *Austin*, 2025 WL 957499 at *1; *Kelley*, 2023 WL 6999445 at *2.

…

1

2

3

4

5

6

       3.     <u>NP Gardner</u>

NP Gardner, like NP McIntosh, had a treating relationship with Plaintiff.  On October 24, 2022, NP Gardner completed a checkbox form in which he circled boxes indicating, *inter alia*, that Plaintiff had severe limitations in his ability to relate to other people and to perform work on a sustained basis in a routine work setting.  (AR at 3785-86.)

7

The ALJ deemed NP Gardner's opinions "not persuasive," explaining:

8

9

10

11

12

13

14

> Dr. Gardner's opinion is not persuasive.  His opinion is not supported by the evidence as a whole.  Specifically, mental status examinations show generally normal findings with the exception of depressed and anxious mood. Further, his opinion is inconsistent with his own examination findings. Dr. Garner's treatment notes show the claimant is generally normal with a euthymic mood, full affect, clear speech, logical thought process, normal perception, normal cognition, normal insight and judgment, no delusions, no hallucinations, no agitation, no anhedonia, no suicidal ideation and average intelligence.  Dr. Gardner's opinion appears to be based on the claimant's subjective report and not on clinical or objective findings.

15

16

(*Id.* at 43.)

17

18

19

20

21

22

23

24

The analysis as to NP Gardner mirrors the analysis as to NP McIntosh.  Even assuming that Plaintiff's challenges regarding NP Gardner are not forfeited due to a lack of specificity, they fail on the merits.  As set forth in the quoted passage above, the ALJ expressly considered the supportability and consistency factors in relation to NP Gardner, identifying two reasons (lack of support in his own examination findings and overreliance on subjective reports) why the former undermined NP Gardner's opinions and one reason (the "evidence as a whole" shows that "mental status examinations show generally normal findings") why the latter undermined NP Gardner's opinions.

25

26

27

28

The ALJ's conclusion as to each factor was also supported by substantial evidence. As noted, the record is replete with normal mental status examination records, including those performed by NP Gardner.  (AR at 3914, 3917, 3922, 3932, 3939.)  It was rational for the ALJ to conclude that those records undermined both the supportability and consistency of NP Gardner's opinions.  *Woods*, 32 F.4th at 792-93; *King*, 2025 WL

1912359 at *1; *Austin*, 2025 WL 957499 at *1; *Kelley*, 2023 WL 6999445 at *2.[3]

### 4.    Dr. Gross And Dr. Paxton

At the initial level, one of the state agency consultants, Dr. Gross, opined that Plaintiff had mental impairments that met the regulatory definition of a "severe" impairment and would limit Plaintiff to a range of simple and routine work.  (AR at 174-75.)   However, at the reconsideration level, another state agency consultant, Dr. Paxton, opined that Plaintiff's mental impairments were "nonsevere."  (*Id.* at 233-34.)

The ALJ deemed Dr. Gross's opinions "not persuasive" and Dr. Paxton's opinions "persuasive," explaining:

> Dr. Gross' opinion that the claimant's mental impairments are severe is not persuasive, as it is not supported by the evidence of record.  Specifically, mental status examinations show normal findings.  Psychiatric examinations showed the claimant scored 27 points out of 30 points on the mini mental status exam indicating no likelihood of cognitive impairment and his estimated IQ was in the average range.  Further, Dr. Gross' opinion is inconsistent with the claimant's actual level of functioning.  The claimant has been able to reside with friends since the onset date with no reported issues.  During examinations, he is described as cooperative, polite and responsive.  Psychiatric exams revealed the claimant's memory, attention span and concentration are intact. Further, the claimant is able to perform activities of daily living independently.  He manages his medication, pays bills and is able to keep track of his appointments.  It was also noted in the record that the claimant was able to return to work, suggesting his symptoms are not work preclusive.  At reconsideration, psychological consultant, R. Paxton, M.D., opined the claimant's mental impairments were nonsevere.  Dr. Paxton's opinion is persuasive because it is consistent with the evidence as a whole.  Further, Dr. Paxton's opinion is supported by the normal mental status, psychiatric examination and neurological findings described above.

(*Id.* at 39-40.)

As was the case with NP McIntosh and NP Gardner, Plaintiff raises a non-specific challenge to this analysis that simply incorporates, by reference, his general challenge to the ALJ's evaluation of all of the evidence related to his mental/cognitive impairments.

---

[3]    This conclusion makes it unnecessary to address the sufficiency of the ALJ's other stated reason (overreliance on subjective reports) for discrediting NP Gardner's opinions.

1   (Doc. 18 at 22 ["The ALJ found the initial nonexamining reviewer's opinion that Reyes

2   had severe mental impairments and was limited to simple work unsupported by some

3   normal mental status examinations findings and Reyes's activities of daily living.  The

4   insufficiency of that rationale has been addressed above, *supra* at 18-20."].)  This approach

5   is impermissible for the reasons stated above.

6          In addition to being forfeited, the challenge also fails on the merits.  On its face, the

7   ALJ's analysis regarding Dr. Gross and Dr. Paxton was sufficient under the new

8   regulations.  The ALJ considered the supportability and consistency factors in relation to

9   both Dr. Gross and Dr. Paxton, ultimately identifying three reasons—inconsistency with

10  "the evidence of record," including normal mental status exams; inconsistency with

11  Plaintiff's activities of daily living ("ADLs"); and inconsistency with the opinions of Dr.

12  Paxton—why they undermined Dr. Gross's opinions.

13         The ALJ's conclusions were also supported by substantial evidence.  First, for the

14  reasons stated above in relation to NP McIntosh and NP Gardner, it was rational for the

15  ALJ to conclude that Dr. Gross's opinions were inconsistent with, and not supported by,

16  the many mental status exams reflecting normal findings.  Second, for the same reason, it

17  was rational for the ALJ to deem Dr. Paxton's opinions persuasive.  This determination, in

18  turn, made it permissible for the ALJ to discredit Dr. Gross's opinions on the ground that

19  they were inconsistent with the more-persuasive opinions of Dr. Paxton.  *See* 20 C.F.R.

20  § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . . is with the evidence from

21  other medical sources and nonmedical sources in the claim, the more persuasive the

22  medical opinion(s) . . . will be.").  *See also Martinez v. Comm'r of Soc. Sec. Admin.*, 2023

23  WL 6211407, *7 (D. Ariz. 2023) ("The Court also finds no error in the ALJ's other reason

24  for discounting Cruz's opinions pursuant to the consistency factor, which was that they

25  conflicted with the less-restrictive opinions of the other medical sources whom the ALJ

26  deemed persuasive."); *Michele I. v. Comm'r, Soc. Sec. Admin.*, 2022 WL 4533962, *5-6

27  (D. Or. 2022) ("The ALJ considered the two most important factors in evaluating PA

28  Laughlin-Hall's medical opinion—supportability and consistency—and the record

supports the ALJ's conclusions.  The ALJ . . . not[ed] PA Laughlin-Hall's opinion 'markedly conflict[s] with opinions of the reviewing physicians for the State agency who examined the claimant's medical records' . . . .  The ALJ's consideration of PA Laughlin-Hall's medical opinion is supported by substantial evidence."); *Rafael G. v. Kijakazi*, 2022 WL 3019935, *6 (S.D. Cal. 2022) ("[I]inconsistency with two similar agency consultant opinions further supports the ALJ's inconsistency finding.").[4]

### 5.  Dr. General

Dr. General evaluated Plaintiff on December 17, 2020 at the request of the agency and then drafted a nine-page evaluation report.  (AR at 1809-17.)  In it, Dr. General noted that Plaintiff "scored 27 points out of a possible 30 points" on a mini-mental status examination ("MMSE"), which "indicates no likelihood of cognitive impairment."  (*Id.* at 1815.)  Dr. General ultimately diagnosed Plaintiff with "Major Depressive Disorder, Recurrent Episode, Moderate/Severe" and opined that Plaintiff "is seen as being capable of managing benefit payments in his best interest should he receive them" and has a "good" ability "to perform work-related tasks . . . on the basis of his cognitive functions as assessed by the [MMSE]."  (*Id.* at 1816.)  However, Dr. General then added: "Albeit his cognitive functions are grossly intact, one wonders whether he would be capable of maintaining that level of cognitive functioning throughout an eight-hour day and/or a five-day workweek. This is doubtful, based on the above presentation."  (*Id.*)

Dr. General also filled out a "Psychological/Psychiatric Medical Source Statement." (*Id.* at 1817.)  In that form, Dr. General opined that Plaintiff's "[i]mmediate recall is good/average for simple and complex instructions"; that Plaintiff's "[s]hort-term memory is weak for simple directions, based on the [MMSE]"; that Plaintiff's "[l]ong-term memory is average for work-like procedures"; that Plaintiff's "attentiveness was good throughout the entirety of this 55' examination"; that Plaintiff's "concentration is good for conversational discourse and he is average at math"; that Plaintiff's "[h]ygeine is good, but

---

[4]    Given these conclusions, it is unnecessary to address the sufficiency of the ALJ's other stated reason (inconsistency with ADLs) for discrediting Dr. Gross's opinions.

grooming is deficient"; that Plaintiff "was cooperative and responsive during his examination"; and that Plaintiff "is capable of requesting help and is capable of acknowledging responsibility for his mistakes." (*Id.*)

The ALJ deemed Dr. General's opinions "not persuasive," explaining:

> Dr. General's opinion that the claimant[] would have severe cognitive impairment is not persuasive, as it is inconsistent with the objective findings and instead based on the claimant's presentation. Further, his opinion regarding weak memory for simple directions and deficient grooming are not significant are not supported by the record. Mental status examinations show normal findings. Providers note the claimant was appropriately dressed, well-groomed and cooperative, with normal speech, coherent thought process, intact memory, fair insight, no impairment of judgment, and normal cognition. Further, he scored 27 points out of 30 points on the mini mental status exam indicating no likelihood of cognitive impairment and his estimated IQ was in the average range.

(*Id.* at 40.)

In challenging the sufficiency of this analysis, Plaintiff again attempts to incorporate, by reference, his general challenge to the ALJ's evaluation of all of the evidence related to his mental/cognitive impairments but also adds some arguments that are specific to Dr. General: "[T]he ALJ found the opinion from Dr. General, the agency examining psychologist, unpersuasive based on the ALJ's belief it was unsupported and inconsistent with normal mental status examination findings and based on Reyes's subjective complaints. Again, the insufficiency of that rationale has been addressed above, *supra* at 18, 20-21, and was contradicted by the fact that Dr. General was hired by the agency to examine [Plaintiff], he reviewed background medical records, and that Dr. General confirmed the notation regarding [Plaintiff's] inability to maintain competitive employment was based on 'the above presentation,' which included Dr. General's direct examination of [Plaintiff]." (Doc. 18 at 21-22.)

These arguments are unavailing. The ALJ expressly considered the supportability and consistency factors in relation to Dr. General and the ALJ's analysis as to each factor was supported by substantial evidence. As for supportability, it was rational for the ALJ

to conclude that Dr. General's conclusions regarding the severity of Plaintiff's cognitive impairments, and the weakness of Plaintiff's short-term memory, were inconsistent with the results of the MMSE that Dr. General administered, which showed that Plaintiff scored a 27/30 and had no cognitive impairment. Turning to consistency, it was rational for the ALJ to conclude that Dr. General's opinions regarding the weakness of Plaintiff's short-term memory and the deficiency of Plaintiff's grooming were inconsistent with the many medical records from other providers reflecting normal mental status and cognitive function and appropriate grooming.

Plaintiff's specific arguments regarding Dr. General do not compel a different outcome. The fact that Dr. General "was hired by the agency to examine" Plaintiff has no bearing on whether the ALJ was required to accept the persuasiveness of Dr. General's opinions—instead, under the new regulations, the ALJ was required to evaluate Dr. General's opinions by considering the supportability and consistency factors. Finally, because the ALJ identified multiple valid reasons, supported by substantial evidence, for discrediting Dr. General's opinions pursuant to the supportability and consistency factors, any error in the ALJ's statement that Dr. General's opinions could be discredited because they were solely "based on the claimant's presentation" was harmless.

### 6.    Dr. Frey

Dr. Frey, a neurologist, testified at Plaintiff's hearing. (AR at 150-54.). Dr. Frey opined that "from a neurological standpoint, [Plaintiff] has two impairments. The first is seizures and the second is mild cognitive impairment." (*Id.* at 151.) Dr. Frey further testified that these impairments were not sufficient to "meet or equal any of the listings" and that Plaintiff could perform a range of light work with postural, environmental, and manipulative limitations. (*Id.* at 151-52.) Later, Dr. Frey clarified that "I did not evaluate [Plaintiff] from a psychiatric standpoint. . . . I did just do the physical evaluation in this case." (*Id.* at 153-54.) Nevertheless, Dr. Frey stated that Dr. General's opinion that Plaintiff would likely be unable to maintain pace for a full workday or workweek was "reasonable." (*Id.* at 154.)

The ALJ deemed Dr. Frey's opinions "somewhat persuasive," explaining:

> Dr. Frey's opinion is somewhat persuasive, as it is generally consistent with the record. However, the undersigned finds the reaching limitation is not supported by the record. Specifically, examinations performed after his surgery show improvement. By October 2020, the claimant's pain was described as well controlled and his movement was good. Additionally, neurological exams showed no limitations of his right arm and full strength.

(*Id.* at 40.)

Plaintiff contends the ALJ's evaluation of Dr. Frey's opinions was flawed because the ALJ (1) "failed to evaluate Dr. Frey's finding that one of [Plaintiff's] severe impairments was 'mild cognitive impairment'"; and (2) failed to "evaluate Dr. Frey's confirmation that Dr. General's conclusion that [Plaintiff] was likely unable to maintain pace for competitive employment was reasonable." (Doc. 18 at 22.) In response, the Commissioner contends the first criticism lacks merit because "Dr. Frey's diagnosis of a mild cognitive impairment was not medical opinion evidence," *i.e.*, an opinion regarding Plaintiff's restrictions and limitations, and the second criticism lacks merit because (1) Dr. Frey clarified that she was only retained to evaluate Plaintiff from a physical, and not psychiatric, standpoint, and (2) regardless, because the ALJ provided legally sufficient reasons for discrediting Dr. General's opinions, the ALJ was not required to provide additional reasons for rejecting Dr. Frey's statement of agreement with those opinions. (Doc. 22 at 15-16.) Plaintiff does not respond to these specific arguments in his reply. (Doc. 23.)

The ALJ's analysis of Dr. Frey's opinions was free of harmful error. Any error in failing to address Dr. Frey's statement that Plaintiff's cognitive limitations qualified as a "severe" impairment was harmless because, as discussed in earlier portions of this order, the ALJ resolved step two in Plaintiff's favor and proceeded to the later steps of the disability analysis. (Also, Dr. Frey further clarified, consistent with the ALJ's step-three determination, that none of Plaintiff's impairments met or equaled a listing.) Finally, it is doubtful that the ALJ was even required to address Dr. Frey's statement that she believed

Dr. General's opinions were reasonable, given Dr. Frey's clarification that she only evaluated Plaintiff from a physical and not psychiatric standpoint, and any error in failing to specifically address that statement was harmless given that the ALJ provided legally sufficient reasons for discrediting Dr. General's opinions.

C.    **The ALJ's Assessment Of Dr. Araghi's Opinions Related To Plaintiff's Physical Impairments**

Plaintiff's last challenge concerns the ALJ's evaluation of the opinions of Dr. Araghi.    As background, Dr. Araghi twice performed surgery on Plaintiff's right shoulder—one procedure took place on June 8, 2021 and the other took place on August 10, 2021.  (AR at 2111-13, 2372-74.)  In addition to performing those surgeries, Dr. Araghi provided several opinions regarding Plaintiff's physical limitations.  First, on July 6, 2021, Dr. Araghi filled out a checkbox form indicating that Plaintiff's shoulder condition would limit him to lifting less than 10 pounds, carrying less than 10 pounds, and reaching and using his right hand on a "[l]ess than occasional" basis and would also cause him to miss 6+ days of work per month.  (AR at 2327-28.)  Second, on September 1, 2021, Dr. Araghi wrote a letter stating that Plaintiff "has had long-standing shoulder problems" and "will not even be able to work as a hairdresser." (*Id.* at 2639.)  Third, on October 3, 2022, Dr. Araghi filled out a checkbox form that contained opinions similar to those set forth in the July 6, 2021 checkbox form.  (*Id.* at 3799-3801.)

The ALJ deemed Dr. Araghi's opinions "not persuasive," explaining:

Dr. Anaghi's[5] opinion that the claimant is unable to work is not persuasive, as it is inconsistent with the evidence as a whole.  The claimant reported to providers on multiple occasions that he was working as a hairstylist.  Further, his opinion is not supported by the clinical and objective findings in the record.  Physical examinations reveal the claimant had full range of motion of the extremities, normal strength, tone and reflexes and intact sensation.  He exhibited 4/5 to 5/5 strength in the right shoulder.   Neurological examinations showed the claimant's motor strength was grossly normal, no atrophy, normal strength in all limbs, normal sensation, normal coordination, normal Romberg testing and normal ability to tandem walk.  These findings

_____

[5]    The ALJ misspelled Dr. Araghi's last name as "Anaghi."

1    do not support the extreme limitations assessed by Dr. Anaghi and instead
2    support the conclusion reached herein.

3    (*Id.* at 40.)

4          The Court finds no harmful error in the ALJ's evaluation of Dr. Araghi's opinions.

5    First, although the ALJ did not explicitly use the word "supportability," the ALJ considered

6    this factor by emphasizing the lack of "support[] by the clinical and objective findings in

7    the record." *Darling v. Kijakazi*, 2023 WL 4103935, *1 (9th Cir. 2023) ("An ALJ is not

8    required to incant the 'magic words' of 'supportability' and 'consistency' in his findings.").

9          This finding was supported by substantial evidence.  Plaintiff's argument on this

10   issue appears to be that because Dr. Araghi performed two of the surgeries, Dr. Araghi

11   must have based his opined-to limitations on supporting objective and clinical findings.

12   (Doc. 23 at 9 ["The Commissioner attempted to diminish Dr. Araghi's assessments due to

13   limited observations noted directly from Dr. Araghi, but the Commissioner ignored that

14   Dr. Araghi performed two of the four right shoulder surgeries that Reyes endured during

15   the relevant period—a surgeon does not perform multiple surgeries with no medical basis

16   for doing so."].)  This argument misses the mark because, as the ALJ's extensive analysis

17   makes clear, the ALJ focused on the objective evidence of Plaintiff's improvement

18   *following* the surgeries as a reason why Dr. Araghi's opined-to limitations were too severe.

19   The ALJ's decision contains a lengthy chronological discussion of the medical evidence

20   related to Plaintiff's shoulder, noting that a CT scan of Plaintiff's shoulder following a

21   surgery in November 2019 "revealed that the stem appeared stable" (AR at 37); that

22   although Plaintiff then underwent another surgery in December 2019, Plaintiff "had good

23   range of motion in his right shoulder and no evidence of swelling" following that surgery

24   (*id.*); that although Plaintiff then periodically complained about shoulder pain following

25   that surgery, Plaintiff also sometimes reported improvement and also "admitted being

26   noncompliant with treatment following his prior surgery, which resulted in increased pain"

27   (*id.*); that although Plaintiff underwent another surgery in September 2020, Plaintiff

28   reported following this surgery that his "pain was well controlled" and that post-surgery

imaging "showed no fractures, normal soft tissues and normal position of implants with no loosening or complications" (*id.*).  Most important here, the ALJ also cited records from testing and examinations that occurred *after* June 2021 and August 2021 (*i.e.,* the dates of the two surgeries performed by Dr. Araghi) that revealed significant improvement in Plaintiff's shoulder.  For example, the ALJ cited a report from December 2021 in which Plaintiff "reported 0/10 pain and feeling stronger."  (*Id.* at 38.)[6]  The ALJ also cited "[n]eurological examinations" in June 2022, September 2022, and October 2022 that "showed the claimant's motor strength was grossly normal, no atrophy, normal strength in all limbs, normal sensation, normal coordination, no ataxia, normal Romberg testing and normal ability to tandem walk."  (*Id.*)[7]  The ALJ also cited the "consultative examination with Dr. Joy in January 2023" that revealed "5/5 strength in the left upper extremity and 4/5 strength in the right upper extremity" as well as "normal grip strength and intact sensation."  (*Id.*)[8]  And the ALJ also cited "an exam in May 2023" during which Plaintiff's "orthopedist noted no evidence of atrophy."  (*Id.*)[9]  In contrast, there is no evidence that Dr. Araghi made any clinical findings or observations regarding Plaintiff's shoulder function following the last surgery.  Given this backdrop, it was rational for the ALJ to conclude that the supportability factor undermined the persuasiveness of Dr. Araghi's opinions.

For similar reasons, the ALJ's analysis of the consistency factor was supported by substantial evidence.  Again, the ALJ provided an extensive analysis of the longitudinal record related to Plaintiff's shoulder, acknowledged that Plaintiff had required surgeries and experienced periods of pain, but also cited an array of medical records reflecting that Plaintiff experienced significant improvement following the final surgery.  The ALJ also included shoulder-related limitations in the RFC, albeit limitations that were not as severe

---

[6]     The ALJ stated that this report appears at B68F/28, which corresponds to AR 3638.

[7]     The ALJ cited the records appearing at B50F/2, B66F/2, and B71F/2.  Those records appear at AR 2865 (June 3, 2022 medical report), AR 3605 (September 12, 2022 medical report), and AR 3781 (October 21, 2022 medical report).

[8]     The report from Dr. Joy's consultative examination appears at AR 3826-30.

[9]     The ALJ stated that this report appears at B97F/3, which corresponds to AR 4008.

as those recommended by Dr. Araghi.  On this record, it was rational for the ALJ to conclude that the consistency factor undermined the persuasiveness of Dr. Araghi's opinions.[10]

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is **affirmed**.  The Clerk shall enter judgment accordingly and terminate this action.

Dated this 8th day of September, 2025.

_____
Dominic W. Lanza
United States District Judge

---

[10]    These determinations make it unnecessary to resolve whether substantial evidence also supports the ALJ's determination that a conflict existed between the statement in Dr. Araghi's September 1, 2021 letter that Plaintiff "will not even be able to work as a hairdresser" and Plaintiff's statements on that topic.